# EXHIBIT C



**DEPARTMENT OF DEFENSE**
**FREEDOM OF INFORMATION DIVISION**
**1155 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1155**

Ref: (N.D. Cal.) No. 14-cv-2166

THROUGH COUNSEL

Rex S. Heinke
Akin Gump Strauss Hauer & Feld LLP
1999 Avenue of the Stars
Suite 600
Los Angeles, CA 90067-3010

Nov 7, 2017

SUBJECT: Impending Release of Additional Information in Response to FOIA Request

Mr. Heinke:

The Department of Defense ("DoD") responds to your November 3, 2017 letter sent on behalf of your client Sikorsky Aircraft Corporation ("Sikorsky"). In this letter, you respond to DoD's letter of October 12, 2017 notifying Sikorsky pursuant to 32 C.F.R. § 286.10(g) of the intended release of currently redacted information in Sikorsky's FY2013 Comprehensive Small Business Subcontracting Plan (the "Plan"). Sikorsky objects to the release of almost all of the information that DoD plans to release. While DoD has no obligation under the regulations to respond to objections submitted after notice sent pursuant to § 286.10(g), it does so in this case, which is in active litigation, to erase any doubt as to whether Sikorsky's objections have been addressed. DoD stands by its original decision to release the information, with very limited exceptions regarding individuals' contact information, and by this letter again notifies Sikorsky pursuant to § 286.10(g) that it will release the information described in Exhibit A on November 10, 2017. Pursuant to an agreement reached by counsel for Sikorsky and DoD, Sikorsky will not assert that it was not given "reasonable time" pursuant to § 286.10(g)(3).

DoD originally withheld the redacted information in the Plan pursuant to FOIA Exemptions 4 and 6. *ASBL v. DoD*, 674 Fed. App'x 675, 676 (9th Cir. 2017). In making its determination as to whether to withhold or redact the information in the Plan, DoD must assess whether it can meet its burden under the applicable legal standard. *See GC Micro Corp. v. DLA*, 33 F.3d 1109, 1115 (9th Cir. 1994) (government bears the burden). The test for whether commercial information is "confidential" such that it is exempt under Exemption 4 is whether "'there is (1) actual competition in the relevant market, and (2) a likelihood of substantial competitive injury if the information were released.'" *ASBL*, 674 Fed. App'x at 676 (citing *Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1079 (9th Cir. 2004)). In making the assessment, the court "must balance the strong public interest in favor of disclosure against the right of private businesses to protect sensitive information." *GC Micro*, 33 F.3d at 1115. In *GC Micro*, the Ninth Circuit required the government to demonstrate precisely how data could cause substantial competitive harm. *GC Micro*, 33 F.3d at 1114-15. In the pending litigation regarding this Plan, the district court has raised particular concerns, including the following questions:

1

**MSJ000112**

[H]ow stale is the information in the requested document; (2) has any part of the requested document's content been disclosed in any other setting; (3) what steps has Sikorsky taken to maintain the confidentiality of the requested document's content, including its actions with its own employees; and (4) how does suppression of the requested document square with the Small Business Act's mandate to encourage government contractors to subcontract to small disadvantaged businesses?

*ASBL v. DOD*, No. C 14-02166 WHA, 2014 WL 6662427, at *2 (N.D. Cal. Nov. 23, 2014).

With regard to Exemption 4, DoD withheld information in the Plan on the basis of testimony from Sikorsky employee Amy M. Johnson. The Ninth Circuit held that this testimony "at least created a genuine issue of fact as to whether most of its redactions qualified for Exemption 4." *ASBL*, 674 Fed. App'x at 676. Because there was a genuine issue of fact, the parties subsequently engaged in discovery. The discovery involved the depositions of Ms. Johnson, as well as two additional Sikorsky witnesses (in addition to one witness for DoD). This discovery revealed that at least for some of the information that had been redacted, the Company's witnesses were unable to establish that there is a likelihood of substantial competitive injury in the relevant market, which has been defined by the Ninth Circuit as "government defense contracts." *Id*. This failure is particularly acute given that the information in the Plan is now over five years old.

First, Ms. Johnson, Sikorksy's supply chain executive, was unable to provide any detailed information regarding the subcontracts at issue during her deposition. She could not recall the details of any non-disclosure provisions used by Sikorsky to limit dissemination of information. Johnson Depo. at 34:3-35:8. She did not know whether Sikorsky's contracts with suppliers required exclusivity. *Id*. at 37:23-38:24. Prior to reaching her conclusion that disclosure would harm Sikorsky's competitive interests, she did not check whether Sikorsky is currently still using any of the subcontractors, and when asked, did not know with certainty. *Id*. at 56-13:58:20 (identifying that "two for sure" of the four subcontactors on page 19, "five for sure" of the fifteen subcontactors on page 20, and "five for sure" of the seven subcontactors on page 21 were still being used). When asked how she reached her determination that disclosure of information in the Plan would harm Sikorksy's competitive position, she stated that she relied entirely on her "experience" with "sourcing and sourcing strategies" *Id*. at 40:22-41:24. When probed about her experience, she failed to supply any additional information to support her assertions. She listed Bell as a competitor that could benefit from the information, but admitted that she was "not familiar" with either Bell's product line or its customers. *Id*. at 106:16-107:11. Similarly, she stated that Boeing was a competitor, but, again, did not know whether Boeing manufactures combat capable helicopters or sells helicopters to the United States government. *Id*. at 107:12-18; *see also id*. at 107:19-108:19, 111:13-112:22, 116:3-23 (same answers for five other competitors listed by Johnson in her declaration). Ultimately, Ms. Johnson was asked whether she was aware of whether *any* of the companies she listed in her declaration as competitors were providing helicopters to the Department of Defense, and she admitted that she "was not aware." *Id*. at 118:3-7. She also professed no knowledge about whether Sikorksy's contracts with the government were single source or competitive. *Id*. at 126:21-23.

MSJ000113

Mr. Driver, Sikorsky's Senior Manager of Strategy, was unable to fill in many of the blanks left by Ms. Johnson's testimony. He did not know whether Sikorksy's contracts with subcontractors have nondisclosure provisions or otherwise prohibit suppliers from discussing the work they do with Sikorsky, and admitted that he has seen subcontractors advertise that they are suppliers to Sikorksy. Driver Depo. at 11:10-16, 12:9-16, 60-:8-25. In particular, he testified:

Q: What steps does Sikorsky take to eliminate or minimize competitive harm that would come through the disclosure of their suppliers?
A: Try to prevent the disclosure of who our suppliers are.
Q: You try to prevent the disclosure?
A: I don't know. Sorry, I apologize. I don't know the policy or process.
Q: Well, instead of the policy or process, what steps do you take?
A: Agreements with suppliers, nondisclosure agreements, things like that.
Q: But you can't tell me as you sit here today whether any of the suppliers that are mentioned in the document we're discussing have nondisclosure agreements that prevent them from saying they're a contractor with Sikorsky; isn't that correct?
A: I do not know.
Q: You don't know. Okay. And do you know who at Sikorsky would know?
A: No.

*Id.* at 72:22-73:23.

Mr. Driver made a wholesale conclusion that release of the information in the Plan could harm Sikorsky, but in reaching this conclusion he did not evaluate whether any of the information was already publicly disclosed, or whether the subcontractors listed in the Plan are current suppliers to Sikorsky. *Id.* at 123:11-16; 126:13-16; 127:5-12; *see generally id.* at 136:17-139:12. He admitted that he made no effort to determine whether the companies listed in the Plan are current subcontractors, despite his opinion that the names of past (as opposed to current) subcontractors are not sensitive. *Id.* at 126:2-127:1.

Finally, with regard to Martha Crawford, Sikorsky's Small Business Liaison Officer, she testified that revealing the information *could* cause harm. Crawford Depo at 71:24-72:2 ("Q: Would revelation of the names provide a competitor with a possible competitive advantage? A: It could."); *see also id.* at 146:9-149:19 (information "could help a competitor" and "could be a competitive advantage", but also agreeing that it is possible the disclosure would not harm Sikorsky). This does not meet the requirement under Exemption 4 that there be a "likelihood" of substantial competitive injury. Sikorsky's attempt to provide context to her testimony is unconvincing and will be ineffective at a hearing. First, Ms. Crawford's new declaration, attached to the November 3 letter, notes that Sikorsky "may, at its discretion, release the name of some suppliers for a variety of reasons," without any further explanation as to how this impacts the supposed confidential nature of the names of the suppliers. Declaration of Martha Crawford dated October 30, 2017, at ¶ 8. ("Crawford Decl."). *C.f.* Crawford Depo. at 72:3-5 and 141:4-12 (agreeing that Sikorsky sometimes makes the names of subcontractors public, but having no knowledge about who makes that decision).

Ms. Crawford also asserts that release of the "entire Plan" would cause harm to Sikorsky, without any elaboration as to whether any subset of information in the Plan could be released without

3

**MSJ000114**

causing harm. Crawford Decl. at ¶ 9. In particular, she does not address why the release of the name of a subcontractor would cause harm when that particular subcontractor's work with Sikorsky is publicly known and/or the work has been completed. Crawford states that the "information reveals the identity of the qualified small business subcontractors with which we work," implying that Sikorsky still is working with each of the subcontractors listed in the 2013 Plan. However, the limited testimony provided by Sikorsky on this point established that there are at least some subcontractors from the 2013 Plan that are no longer working with Sikorsky (meaning that the information about these subcontractors would be stale). *See* Johnson Depo. at 56-58. Sikorsky has failed to provide any further detail about which of the subcontractors still are working with the company in spite of DoD's repeated requests for such information. Finally, Sikorsky's argument that disclosing information "*in the context of the Plan*," Nov. 3 letter at 3, still does not explain why this disclosure likely would cause substantial competitive harm beyond generic statements to that effect. A simple list of the subcontractors does not show anything about Sikorsky's methods, contrary to the assertions to this effect by Crawford and the other Sikorsky witnesses. And as noted below, the information in the plan about Sikorsky's methods are in many cases publicly known and/or generic in nature.

In particular, Sikorsky has failed to provide any evidence that there is a likelihood of substantial competitive harm in light of the fact that much of the redacted information is publicly available. Once DoD became aware that information might be publicly available, it undertook a thorough review of the scope of such information.[1] We note that the government shared some of its detailed findings with Sikorsky several weeks before notifying Sikorsky of its final decision to release the information, yet Sikorsky still has failed to address DoD's findings in this regard. Instead, in its objections to release, Sikorsky chose only to address two databases that plaintiff ASBL has noted as relevant. The information that DoD has found reveals, *inter alia*, that (i) certain of Sikorsky's internal training methods are listed on multiple employees' LinkedIn profiles;[2] (ii) some of the work described with specific subcontractors has been profiled in such sources as the New York Times;[3] (iii) some of the projects that are redacted have been described in Sikorsky-issued press releases; (iv) several of the subcontractors list the fact that they are Sikorsky suppliers on their websites; and (v) that at least some of the programs that are discussed in the redacted sections have been completed or were cancelled more than five years ago. The fact that information is publicly available certainly does not necessarily mean that it must be disclosed under the FOIA (and often will not mean that), but in the context of this case, and particularly in light of the concerns articulated by the district court, it undercuts Sikorsky's claim of harm from the release of the information. It also demonstrates that much of the redacted information would be considered stale, under the district court's analysis.

---

[1] Mr. Driver testified that to determine the identity of competitors' subcontractors he used "public sources of information" including the "Internet, press releases, [and] trade shows." Driver Depo. at 45:10-18.

[2] *E.g.*, https://www.linkedin.com/search/results/index/?keywords=Sikorsky%20Aircraft%20Supply%20Management%20University

[3] *E.g.*, http://www.nytimes.com/2012/05/19/us/politics/behind-armys-17000-drip-pan-harold-rogerss-earmark.html; http://www.thefabricator.com/article/bending/press-brake-bending-forming-long-and-skinny.

MSJ000115

Finally, DoD's careful review has shown that some of the information, even if not publicly available, is sufficiently generic that it would not provide information such that a competitor could somehow use it against Sikorsky. This is highlighted by Sikorsky's purported rationale for withholding information, namely that it would "reveal Sikorsky's non-public operations and development of methods to comply with [the Plan]." The standard under Exemption 4 is not whether a company would prefer to keep its operations confidential, but whether there is a likelihood of substantial competitive harm. Generic information, even if it reveals operations or methods of Sikorsky, would not cause such harm, particularly when the information relates to operations and methods in place over five years ago.

As to the Exemption 6 information, DoD will agree to keep redacted those employees' phone numbers and email addresses that are not currently publicly available. *See ASBL*, 674 Fed. App'x at 677 ("Although the employees' privacy interests in that information are small, they are not trivial because culprits could use the information for such purposes as harassment or forgery.").

In conclusion, DoD has conducted a careful analysis of Sikorsky's objections, not only in response to the November 3 letter but throughout the course of this litigation. The agency made this decision based upon information learned in discovery as well as the government's independent research. The administrative record, which includes the deposition transcripts and the websites that DoD has found, supports the decision to release. *See Pac. Architects & Engineers Inc. v. Dep't of State*, 906 F.2d 1345, 1348 (9th Cir. 1990) (holding that the agency's decision to release information that a private company claimed was covered by Exemption 4 was not arbitrary and capricious, noting that the "record reflects that the State Department gave careful consideration to [the submitter's] objections"). Sikorsky notes that a concern on the part of DoD as to paying attorneys' fees as a result of the litigation with plaintiff ASBL "cannot be the basis for disclosing otherwise exempt information." This is not the basis for DoD's decision; DoD is releasing information that it does not believe meets the legal standard under Exemption 4. It would be improper for the government to continue to litigate a position that it does not believe is legally supportable.

DoD emphasizes that this case presents unique circumstances, in particular the number of years that have passed and the testimony given by Sikorsky's employees, and these circumstances informed its fact-based decision regarding release. The agency's position as to this particular plan does not mean that DoD will take the same position as to information contained in other similar plans or other documents.

If you have questions, please contact Ellen London at the Northern District of California U.S. Attorney's Office at (415) 436-7288 or Ellen.London@usdoj.gov.

Sincerely,

*Paul J. Jacobsmeyer*

Paul J. Jacobsmeyer
Chief

5